IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>HERBERT K. SUDFELD, JR.,<br><br>    Defendant,<br><br>and<br><br>MARY JO SUDFELD,<br><br>    Relief Defendant. | Civil Action No.<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges:

### SUMMARY OF THE ACTION

1. Attorney Herbert K. Sudfeld, Jr. violated the federal securities laws by using inside information to trade in the common stock of Harleysville Group, Inc. ("Harleysville"), a Pennsylvania-based insurance company. Defendant Sudfeld misappropriated the inside information from the law firm where he worked ("Law Firm"), which was representing Harleysville in a merger.

2. Law Firm advised Harleysville in connection with its merger with Nationwide Mutual Insurance Co. ("Nationwide"). Sudfeld, who was a real estate partner at Law Firm and had no involvement in the merger, learned that the public announcement of the Harleysville-Nationwide merger was imminent from a conversation between an attorney working on the transaction and their shared legal assistant.

3. On the morning of September 28, 2011, the day before the announcement, Sudfeld purchased 1,000 shares of Harleysville stock in the IRA account of his wife, Relief

1

Defendant Mary Jo Sudfeld. Later that day, at approximately 3:58 p.m.—two minutes before the market closed—Sudfeld purchased 2,000 shares of Harleysville stock in his own IRA account.

4. The next day, on September 29, 2011, Harleysville and Nationwide jointly announced that Nationwide would acquire Harleysville for $60 per share in a cash merger valued at approximately $760 million. On the day of the announcement, the price of Harleysville stock rose by 87%.

5. After the public announcement of the merger, Sudfeld sold all 3,000 shares that he had accumulated in both his and his wife's account, realizing ill-gotten gains of $79,410.

6. Defendant Sudfeld knowingly or recklessly engaged in the conduct described in this Complaint, violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, he will continue to violate Section 10(b) and Rule 10b-5.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

8. This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

9. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania.

## DEFENDANT

10. Herbert K. Sudfeld, Jr., age 64, resides in Doylestown, Pennsylvania. He is currently an attorney at a law firm in Doylestown, Pennsylvania. Sudfeld was previously a partner of Law Firm, a national law firm headquartered in Philadelphia.

...

## RELIEF DEFENDANT

11. Mary Jo Sudfeld, age 63, resides in Doylestown, Pennsylvania and is married to Herbert Sudfeld.

## RELEVANT ENTITIES

12. Prior to the merger with Nationwide, Harleysville was a publicly-traded insurance provider and its stock was listed on the NASDAQ Stock Market.

13. Nationwide is a privately held insurance and financial services company headquartered in Columbus, Ohio. Nationwide purchased Harleysville, which is now operated as a wholly-owned subsidiary of Nationwide.

## FACTS

14. Law Firm is a national law firm headquartered in Philadelphia, Pennsylvania, with twenty offices across the United States, including an office in Warrington, Pennsylvania.

15. Sudfeld was a partner in Law Firm's real estate department. He worked in Law Firm's Warrington, Pennsylvania office, a small office with fewer than 30 attorneys.

16. In January 2011, Nationwide and Harleysville began discussing a possible merger. In or around February 2011, Law Firm began advising Harleysville, a long-standing client, in connection with the potential transaction.

17. The Law Firm team advising Harleysville on the merger consisted primarily of attorneys in the Warrington office, including at least three partners and three associate attorneys from that office. Harleysville was one of the Warrington office's most significant clients, and the transaction with Nationwide was the largest merger on which any office of Law Firm had ever advised a client.

18. On August 9, 2011, Nationwide conveyed to Harleysville that it wanted to acquire all of the publicly-held shares of Harleysville stock at a price of $60 per share. On August 19, Nationwide and Harleysville began conducting due diligence in preparation for the merger.

19. Beginning in the middle of August 2011 until the merger agreement was executed on September 28, 2011, the Law Firm team advising Harleysville worked long hours, including

3

nights and weekends. In the final days before the merger was publicly announced, most of the Law Firm team worked out of a hotel in downtown Philadelphia, and thus were noticeably absent from the Warrington office.

20. Nationwide and Harleysville executed the final merger agreement on September 28, 2011, and announced the deal via a joint press release before the markets opened the next day, September 29, 2011.

### A. Sudfeld Learned of the Harleysville-Nationwide Merger Negotiations

21. On September 27, 2011, two days before the merger announcement, Sudfeld learned about the Harleysville merger negotiations.

22. One of the partners and two of the associates advising Harleysville on the transaction shared a legal assistant ("Legal Assistant") with Sudfeld. Legal Assistant and Sudfeld had a working relationship that spanned almost thirty years and were close friends. They jointly owned a vacation home and their families socialized several times each year.

23. On September 27, 2011, Legal Assistant and an attorney for whom she worked who was a member of the Law Firm team advising Harleysville had a conversation about the Harleysville merger. The attorney told Legal Assistant that several Law Firm attorneys were working at a hotel in downtown Philadelphia finalizing a merger agreement between Harleysville and Nationwide and that the merger would be announced in the next day or so. Sudfeld learned about the substance of this conversation between the attorney and Legal Assistant.

24. On September 27 at approximately 3:20 p.m., after learning that the merger would shortly be announced, Sudfeld emailed his stockbroker stating, "Can you call me right away?"

25. Subsequently, at approximately 3:53 p.m., Sudfeld tried to call his stockbroker but did not reach him.

26. Shortly thereafter, between approximately 3:56 p.m. and 4:08 p.m., Sudfeld conducted several internet searches for "Harleysville" on his work computer.

### B. Sudfeld's Illegal Trading

27. The following morning, on September 28, 2011, beginning at approximately 8:17 a.m. and in response to Sudfeld's email and call the prior afternoon, Sudfeld's stockbroker repeatedly attempted to reach Sudfeld by phone.

28. At approximately 9:22 a.m., Sudfeld used his work computer to access the NASDAQ website and searched for "Harleysville."

29. About five minutes later, Sudfeld emailed his stockbroker, writing: "In the office, please call."

30. About fifteen minutes later, at approximately 9:42 a.m., Sudfeld and his stockbroker spoke by telephone for six minutes. At approximately 9:52 a.m., Sudfeld's stockbroker, at Sudfeld's direction, purchased 1,000 shares of Harleysville stock in Mary Jo Sudfeld's account at an average price of $32.35 per share.

31. At approximately 10:08 a.m., Sudfeld's stockbroker called Sudfeld and they spoke for almost one and a half minutes.

32. At approximately 3:53 p.m., less than ten minutes before the close of regular market trading, Sudfeld's stockbroker called Sudfeld and they spoke for approximately three minutes. At approximately 3:58 p.m., two minutes before the market closed, Sudfeld's stockbroker, at Sudfeld's direction, purchased 2,000 shares of Harleysville stock in Sudfeld's IRA account at an average price of $31.57 per share.

33. In total, on September 28, 2011, Sudfeld spent over $95,000 to purchase a total of 3,000 shares of Harleysville stock.

### C. Sudfeld Sold His Stock Immediately After The Public Announcement

34. On September 29, 2011, before the market opened, the Harleysville-Nationwide merger was publicly announced.

35. On September 29 at approximately 9:35 a.m., Sudfeld went to the NASDAQ website and navigated to an article about the merger. About one minute later, Sudfeld spoke

with his stockbroker by telephone.

36. After the call, at Sudfeld's direction, Sudfeld's stockbroker sold the 1,000 shares of Harleysville stock in Mary Jo Sudfeld's account and the 2,000 shares in Sudfeld's account. As a result of his illegal trading, Sudfeld realized a one-day profit of $79,410.

### D. Sudfeld Violated Law Firm's Policies

37. While he was employed by Law Firm, Sudfeld agreed to follow Law Firm's clear and detailed policy regarding securities trading. That policy explicitly forbade firm personnel or members of their household from trading in a client's securities while the firm possessed material nonpublic information about that client. Under the policy, "material information" included, among other things, information relating to acquisitions or mergers.

38. As part of its prohibition on securities trading related to firm clients, Law Firm appended an exhibit to the policy that listed all firm clients that were subject to the policy. By at least September 2011, and prior to the trading at issue here, Harleysville was included on that list.

39. Law Firm periodically posted reminders of firm policies on its intranet, a web page available to Law Firm personnel, including Sudfeld. On September 13, 2011, approximately two weeks before Sudfeld purchased shares of Harleysville stock and before the merger was publicly announced, Law Firm posted a reminder about its insider trading policy on its intranet, including a web-link to the full policy.

40. During the relevant period, Sudfeld knew of Law Firm's securities trading policy and that Harleysville was a client of Law Firm.

41. When Law Firm and others confronted Sudfeld regarding his trading in Harleysville stock, he attempted to conceal his misconduct.

42. On July 30, 2012, Law Firm terminated Sudfeld for failure to comply with Law Firm's securities trading policy.

### E. Sudfeld Violated The Federal Securities Laws

43. As a partner at Law Firm, Sudfeld owed the firm a duty of trust and confidence and was obligated not to misuse information held by Law Firm for his own benefit.

44. Sudfeld knew or recklessly disregarded that he owed a duty of trust and confidence to Law Firm to keep its clients' information confidential and to refrain from trading on it or tipping it to others.

45. Law Firm treated its clients' information as confidential, and established policies and procedures designed to protect such information and to prohibit its employees from trading on such information.

46. In breach of this duty of trust or confidence, Sudfeld misappropriated from Law Firm the material nonpublic information relating to the impending Harleysville-Nationwide merger by purchasing shares of Harleysville stock in both his account and his wife's account on the basis of that information.

47. Sudfeld knew or was reckless in not knowing that the information he misappropriated relating to the impending Harleysville-Nationwide merger was nonpublic and material. Moreover, a reasonable investor would have viewed this information as being important to his investment decision and/or significantly altering the mix of information available to the public.

48. Members of the investing public who sold Harleysville stock at the same time as Sudfeld's purchases were harmed by Sudfeld's conduct because he unlawfully gained an advantage through his misappropriation of inside information.

### CLAIMS FOR RELIEF

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

#### (Against Defendant Sudfeld)

49. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 48, inclusive, as if they were fully set forth herein.

50. By engaging in the conduct described above, Defendant Sudfeld, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    (a)    employed devices, schemes, or artifices to defraud;

    (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

51. By engaging in the foregoing conduct, Defendant Sudfeld violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Claim with Respect to Relief Defendant

### (Against Relief Defendant Mary Jo Sudfeld)

52. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 51, inclusive, as if they were fully set forth herein.

53. Relief Defendant Mary Jo Sudfeld received gains from trades based on material nonpublic information, over which she has no legitimate claim.

54. Relief Defendant Mary Jo Sudfeld obtained the gains described above as part, and in furtherance of, the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for her to retain the funds.

55. By reason of the foregoing, Relief Defendant Mary Jo Sudfeld has been unjustly enriched and must disgorge the amount of her ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant Sudfeld from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendant Sudfeld to disgorge the unlawful trading profits derived from the activities set forth in this Complaint, together with prejudgment interest;

### III.

Ordering Defendant Sudfeld to pay civil penalties up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

### IV.

Ordering Relief Defendant Mary Jo Sudfeld to disgorge all trading profits and other ill-gotten gains to which she does not have a legitimate claim that she received as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon; and

V.

Granting such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

/s/ John V. Donnelly III

Daniel M. Hawke
G. Jeffrey Boujoukos
David L. Axelrod
Kelly L. Gibson
John V. Donnelly III (Pa. Bar No. 93846)
Assunta Vivolo

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: July 16, 2015

10